586 P.2d 1317

Eugene C. SHAHEEN, J. D. Kingery and Arthur Bowman, Trustee of D'Velco Manufacturing of Arizona Employees' Profit Sharing Retirement Trust, an Arizona Corporation, Appellants,

v.

AMERICAN TITLE INSURANCE COMPANY, a Florida Corporation, Appellee.

No. 1 CA–CIV 3407.

Court of Appeals of Arizona, Division 1, Department B.

Oct. 5, 1978.

Rehearing Denied Nov. 8, 1978.

Review Denied Nov. 28, 1978.

Renaud, Cook & Videan, P. A. by J. Gordon Cook, Phoenix, for appellants.

Fennemore, Craig, von Ammon & Udall, P. C. by John J. O'Connor III, Phoenix, for appellee.

## OPINION

JACOBSON, Presiding Judge.

This is an appeal from summary judgment entered in favor of appellee American Title Insurance Company in an action brought by appellants to recover $50,000 lost by American Title's alleged failure to follow escrow instructions. Most of the essential facts were stipulated to by the parties and are undisputed.

Appellants are trustees of a profit-sharing trust for D'Velco Manufacturing of Arizona (D'Velco). In early 1973, a salesman for Western Land Sales Company (Western) approached Mr. Shaheen, one of the trustees of D'Velco, with a proposal for an investment opportunity for the trust. The essence of the transaction was that D'Velco would lend $50,000 to Western and receive in return 12% interest on the loan. As evidence of the debt, D'Velco would receive a $50,000 promissory note. As security for the debt, D'Velco would receive a mortgage on Western's interest as seller in 15 real estate sales agreements. The debt was to be repaid by payments from the buyers of the real estate sales contracts. Both parties agreed to these terms, and further agreed to accomplish the transaction through an escrow.

On February 6, 1973, Vince Jones, senior escrow officer of American Title received letter escrow instructions. As indicated by the letter, enclosed for delivery to American Title were: (1) copies of 15 Agreements for Sale covering certain lots in Arizona, with a total unpaid balance of $60,992.39 that was payable in monthly installments of $963.68; (2) the original, unrecorded blanket mortgage of Western's interest as seller under the 15 agreements, executed by Western and Mr. Shaheen; (3) a $50,000 promissory note, dated February 7, 1973, executed by Western in favor of appellants, with 12% per annum interest, payable at the rate of $500 per month beginning on March 8, 1973; (4) appellants' check for $50,000. American Title received three instructions in the letter. The first required American Title to take the $963.68 received each month under the land contracts and place $500 in one bank account, to be credited to the monthly interest payment on the promissory note, and place the remainder in a second bank account "to accumulate toward the refund of the principal of $50,000.00 due and payable to [D'Velco], as attached note." The second instruction provided for substitution of agreements under the mortgage if any of the original 15 were paid off in cash or forfeited by default. Instruction three dealt with the handling of escrow fees.

American Title disbursed the $50,000 to Western and the monthly payments under the land sales agreements began to be placed in the two bank accounts. After approximately 6 months, the lot payments stopped and the contracts were forfeited by default. No other contracts were substituted by Western. D'Velco discovered that the only interest of Western in several of the lots covered by the agreements was as second beneficiary under two trusts.

D'Velco discovered that the only interest of Western in several of the lots covered by the agreements was as second beneficiary under two trusts. Ultimately, D'Velco learned that its mortgage was worthless. Efforts to recover from Western proved fruitless.

Appellants brought an action against American Title, seeking to recover their $50,000. The trial court granted summary judgment for American Title, and this appeal resulted.

The parties have framed a number of issues, phrased in various ways. Our review of the case leads us to consider three central issues:

(1) Whether American Title was liable to appellants for disbursing the $50,000 to Western in absence of an express instruction authorizing that disbursement.

(2) Whether the escrow instructions made disbursement conditional on recordation of the blanket mortgage.

(3) Whether the escrow instructions made disbursement conditional on American Title's investigation of the state of Western's interest in the real estate covered by the agreements and its assurance that the mortgage provided appellants with adequate security.

Appellants' first argument is that since the escrow instructions were silent as to what was to be done with appellants' $50,000, the escrow agent is liable for disbursing this sum, apparently to anyone. In our opinion, this argument is simplistic and overlooks the realities of the transaction between the principals. Here there is no contention that when Mr. Shaheen delivered the $50,000 to the escrow agent, he did not intend this money to be disbursed to Western. He does contend he expected the escrow agent to protect his position before disbursement—an expectation we deal with later in this decision. In fact, Mr. Shaheen testified that once the trust started receiving monies from the contract of sale, he believed that in fact the escrow agent had disbursed the $50,000 to Western, and that he made no objection to this disbursement on the basis of lack of a specific instruction.

Moreover, this escrow was established in order for the trust to loan to Western the very $50,000 that it is now contended should not have been loaned. To this end, the parties (there is no contention that the escrow agent was involved in the negotiations leading to or preparation of the escrow instructions) instructed the escrow agent to receive payments from the contracts of sale and place those payments in two separate accounts; one for the payment to D'Velco of monthly interest and one "to accumulate toward the refund of the principal of $50,000 due and payable to D'Velco of Arizona Employees' Profit Sharing Plan, as attached note."

The attached note, delivered to the escrow agent, provided that that monthly interest payments were to be made to D'Velco commencing March 8, 1973, approximately one month following the setting up of the collection escrow. The payment of interest on the loan (which was received without objection by D'Velco) assumes that a loan has been consummated, that is, the debtor has received the proceeds of the loan.

■ From the written material received by the escrow agent, we can say as a matter of law that the escrow agent had implied authority, and thus an instruction, to disburse the $50,000 delivered to it to Western. The question then becomes, can an escrow agent be liable for following that implied instruction? A closely related question was presented in *Gordon v. D & G Escrow Corp.,* 48 Cal.App.3d 616, 122 Cal.Rptr. 150 (1975), that is, may an escrow agent be liable for failing to carry out implied instructions? In *Gordon,* the sellers of real property, a husband and wife, set up an escrow to receive payment from a buyer of a parcel of real property. The property sold was held in the name of the wife as her sole and separate property, although both the husband and wife signed the escrow instructions as "sellers." In the language of the court, "[t]he escrow instructions in the case at bench did not expressly state that the sellers were to be paid for selling the property." Matrimonial difficulties subsequently arose between the husband and wife and upon instructions from the wife's attorney, the escrow agent paid the proceeds of the sale to the wife alone. The husband sued the escrow agent, and the escrow agent defended on the basis of lack of a specific instruction as to disbursement of proceeds of sale, arguing that since the wife was the title holder of record, it was justified in paying proceeds to the wife alone. The California Court of Appeals rejected this argument, holding that, "[i]t is clear to us that, absent express instructions to the contrary, an escrow company must disburse to the sellers the proceeds of the sale." *Gordon, supra,* at 621, 122 Cal.Rptr. at 153. Important to the rationale of the court was that such a duty becomes an implied instruction to the escrow agent. Moreover, "sellers" in this context must be ascertained from the escrow instructions themselves; in that case, both the husband and wife were "sellers." The court went on to hold that since the escrow agent disbursed to the wife alone, it breached the implied instructions to pay the proceeds to the sellers, stating:

"[W]e rely on the principle that defendant escrow company simply failed to carry out its instructions which, impliedly if not expressly, called for the proceeds to be paid to the sellers." *Gordon, supra,* at 623, 122 Cal.Rptr. at 154.

We believe that rationale to be applicable here. In this transaction, all parties intended that the debtor Western was to receive the proceeds of the escrow. Under the facts here, there was an implied instruction to the escrow agent to carry out that intent. No liability attaches to the escrow agent in following that implied instruction.

In reality, the D'Velco trustees are not complaining that the escrow agent disbursed the funds to Western, rather they are contending that such disbursement should not have been made without the escrow agent protecting D'Velco's security interest prior to disbursement. We now turn to those contentions.

The D'Velco trustees vigorously assert that American Title should have investigated the nature of Western's interest in the real estate. They maintain this would have been an easy task, since Amtitle, a subsidiary company of American Title that shares office space with American Title, was trustee of the trust which owned most of the 15 lots. There is even deposition testimony that Mr. Jones knew some of the lots were owned by Amtitle as trustee. Appellants argue that the presence of the blanket mortgage in the inventory delivered to American Title on February 6, 1973, coupled with American Title's knowledge that Western was only a second beneficiary under the trusts and owed a substantial amount of money before it received title to the lots owned by the trust, imposed on American Title a duty to consult with appellants before disbursing the money. Appellants maintain that they would have forbidden American Title to disburse the money if they had known that the mortgage did not afford them adequate security.

■ We do not find this argument persuasive. If appellants wished to ascertain the extent of Western's interest in the lots, they should have purchased title insurance. Mr. Shaheen's subjective belief that all escrows included title insurance is irrelevant, since this belief was never communicated to American Title. Certainly the $145 escrow fee received by American Title did not indicate that American Title was expected to render some service beyond the simple collection escrow. American Title was under no obligation to voluntarily disclose information held by Amtitle regarding the extent of Western's interest. *See Lee v. Title Insurance & Trust Co.,* 264 Cal.App.2d 160, 70 Cal.Rptr. 378 (1968). In addition, American Title was not obligated by the escrow to assure appellants that the mortgage offered adequate security. If appellants desired that information, they should have consulted a lawyer. *See National Bank of Washington v. Equity Investors,* 81 Wash.2d 886, 506 P.2d 20 (1973).

■ Appellants argue that, at least, the presence of the mortgage made the escrow ambiguous and American Title should be liable for disbursing the money without consulting them, citing *Gardenhire v. Phoenix Title & Trust Co.,* 11 Ariz.App. 557, 466 P.2d 776 (1970). Here, the instructions were not ambiguous in this respect, and no situation arose which required the escrow agent to act beyond the express letter of the escrow instructions. The appellee took no action with respect to the mortgage because none was required by the instructions. *See Union Title Co. v. Burr,* 102 Ariz. 421, 432 P.2d 433 (1967). The mere presence of the mortgage does not create the type of ambiguity involved in *Gardenhire.*

The judgment of the trial court is affirmed.

OGG, J., concurs.

EUBANK, Judge, dissenting.

I dissent from that portion of the majority opinion which holds that the evidence established, sufficient to affirm the summary judgment, that the escrow agent had "implied authority" to disburse funds. As to the other issues, I concur with the majority.

The majority opinion makes new escrow law in Arizona. It approves the action of

an escrow agent who paid $50,000 out of escrow when the escrow instructions did not expressly authorize such payment. The majority affirm the summary judgment and approve of the payment on the basis of "implied instruction" and "implied authority" described by the California Court of Appeals in *Gordon v. D & G Escrow Corporation,* 48 Cal.App.3d 616, 122 Cal.Rptr. 150 (1975).

I disagree with the majority because clear Arizona precedents, described below, indicate that an escrow agent is not entitled to assume, on the basis of nebulous "implied authority," that he may disburse funds when the escrow instructions do not expressly authorize that action. Rather, under Arizona law, an escrow agent faced with unclear or ambiguous instructions is required to obtain supplemental instructions before proceeding beyond the written authority of the original instructions. As a result, the minimum that this Court should now hold is that there are genuine issues of fact concerning the agent's authority, and that the summary judgment was therefore inappropriate to that extent.

In *Buffington v. Title Insurance Co. of Minnesota,* 26 Ariz.App. 97, 99–100, 546 P.2d 366, 368–9 (1976), Judge Ogg of our Court summarized the duties of an escrow agent in the following language:

> The law is well settled in this state that an escrow agent acts in a fiduciary capacity and must conduct the affairs with which he is entrusted with scrupulous honesty, skill and diligence. *Tucson Title Ins. Co. v. D'Ascoli,* 94 Ariz. 230, 383 P.2d 119 (1963); *Higgins v. Kittleson,* 1 Ariz. App. 244, 401 P.2d 412 (1965). The escrow agent is a trustee and must act in accordance with the terms of the escrow agreement. *Malta v. Phoenix Title & Trust Co.,* 76 Ariz. 116, 259 P.2d 554 (1953); *Higgins v. Kittleson,* supra.

The consequences of a wrongful delivery of a deed out of escrow is discussed in Volume 30A, *C.J.S. Escrows* § 11 at page 1004, which reads:

> Where property deposited in escrow is delivered or disposed of without compliance with the conditions of the deposit, the depositor is entitled to recover such damages as he may suffer through the depository's unwarranted act . . .

See also 30A *C.J.S. Escrows* § 12.

> *Laurentide Leasing Co. v. Schomisch,* 382 Mich. 155, 169 N.W.2d 322 (1969); *Allen v. Allen Title Co.,* 77 N.M. 796, 427 P.2d 673 (1967).

The summary judgment for the title company in *Buffington* was reversed, and this Court ruled that *Buffington* had stated a cause of action against the title company since an escrow agent who wrongfully forfeits out a buyer's interest may be liable for damages suffered by the buyer. Our Court also held that valid questions of fact remained, such as whether the title company had breached its fiduciary duty to Buffington, and his damages, if any, precluding summary judgment.

In *Union Title Co. v. Burr,* 102 Ariz. 421, 423, 432 P.2d 433, 435 (1967), our Supreme Court in upholding the refusal of the title company to pay a commission out of a special fund, said, "Union's duty as an agent was to comply strictly with the terms of the escrow agreement." Union's strict compliance with its instructions precluded liability for its refusal to disburse. *See also Malta v. Phoenix Title & Trust Co.,* 76 Ariz. 116, 259 P.2d 554 (1953). Strict compliance in *Burr* precluded liability for the title company escrow.

In *Tucson Title Insurance Co. v. D'Ascoli,* 94 Ariz. 230, 383 P.2d 119 (1963), the escrow instructions allowed the escrow agent to disburse funds for specified purposes for 15 days; thereafter the agent was "to hold for my further instructions." The agent did not "hold," and our Supreme Court affirmed the jury verdict for damages against the escrow company stating: "It follows that the jury was justified in finding a violation of the conditions of the escrow agreement and in assessing the damages in

a sum equal to that deposited in escrow." *Id.* at 235, 383 P.2d at 122.

Further, our Court has held that where the escrow terms are ambiguous and the escrow agent has reason to know of the ambiguity, he has a duty to communicate with his principal before disbursing prepayment funds. *Gardenhire v. Phoenix Title and Trust Co.,* 11 Ariz.App. 557, 559, 466 P.2d 776, 778 (1970). Otherwise, liability for damages will result. *Id. See also Brean v. North Campbell Professional Building,* 26 Ariz.App. 381, 548 P.2d 1193 (1976).

Finally, in *Miller v. Craig,* 27 Ariz.App. 789, 558 P.2d 984 (1976), a case somewhat similar on the facts to this one, we held that the escrow agent deviated from and exceeded his authority under the escrow agreement where he disbursed $5,000 from escrow without obtaining the vendor's consent where the escrow instructions did not authorize the disbursement.

In light of these cases, it is clear that Arizona law does not allow an escrow agent to imply authority to disburse the funds of his principal. Since the escrow instructions did not provide for disbursal of the $50,000, the escrow agent was obligated to obtain the consent of the appellants before acting. At a minimum, there are genuine issues of fact concerning the escrow agent's authority and, as to that issue, the summary judgment was improper and I would reverse and remand the case for trial on this issue.

The second and third issues must be resolved in appellee's favor and, consequently, I concur with the majority opinion regarding these two issues.